# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-0784V
UNPUBLISHED

| | |
|---|---|
| LINDA BERGSTROM,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: November 2, 2021<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Edward M. Kraus*, Law Offices of Chicago Kent, Chicago, IL, for Petitioner.

*Mark Kim Hellie*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On May 28, 2019, Linda Bergstrom filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving the influenza ("flu") vaccine on January 29, 2018. Petition at 1, ¶¶ 1, 20. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$81,115.32**, **representing compensation in the amount of**

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**$80,000.00 for actual pain and suffering, and $1,115.32 for past unreimbursable expenses.**

### I.     Relevant Procedural History

Respondent initially opposed compensation in this case based on his belief that Petitioner had failed to establish the onset required for a Table SIRVA, within 48 hours of vaccination. Rule 4(c) Report, filed Sept. 15, 2020, at 5, ECF No. 20; *see* 42 C.F.R. § 100.3(a) XIV.B. (2017) (Table entry for SIRVA); 42 C.F.R. § 100.3(c)(10)(ii) (Qualifications and Aids to Interpretation ("QAI") regarding timing of pain). After I issued a fact ruling, finding that the onset of Petitioner's SIRVA occurred within 24 hours of vaccination, Respondent filed an amended Rule 4(c) Report indicating that he would no longer contest entitlement. ECF No. 24; *see* Fact Ruling, issued Dec. 4, 2020, ECF No. 22. For approximately seven months, the parties attempted to informally resolve the issue of damages in this case. *See, e.g.,* Status Report, filed June 1, 2021, ECF No. 34.

On August 17, 2021, the parties informed me that they had reached an impasse in their damages discussions and "d[id] not believe that additional negotiations will result in an agreement on damages." Status Report at 1, ECF No. 36. They proposed consecutive briefing dates. *Id.* The parties filed their briefs as proposed, and Petitioner filed documentation related to her out-of-pocket expenses. ECF Nos. 38-40. The matter is now ripe for adjudication.

### II.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V,

2

1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### III.     Prior SIRVA Compensation Within SPU[4]

#### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2021, 2,097 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,036 of these cases, with the remaining 61 cases dismissed.

Of the compensated cases, 1,187 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 69 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[5]

1,092 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 26 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 849 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do

---

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[5] *See, e.g., Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[6] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *69* | *1,092* | *26* | *849* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $75,000.00 | $70,000.00 | $90,000.00 | $45,000.00 |
| **Median** | **$97,500.00** | **$90,350.00** | **$115,214.49** | **$65,000.00** |
| **3rd Quartile** | $125,360.00 | $119,502.79 | $158,264.36 | $90,000.00 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 69 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $95,500.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,000.00.[7]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment of 40 days to over six months. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 29 months, with petitioners averaging approximately nine months of pain.

---

[6] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[7] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering. In the fourth case involving an award of future pain and suffering, the petitioner provided evidence of an ongoing SIRVA expected to resolve within the subsequent year.

### IV.  Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult, with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including all medical records and affidavits filed, plus the parties' briefs and other pleadings. I also have taken into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and rely upon my experience adjudicating these cases. However, I base my ultimate determination on the specific circumstances of this case.

#### A.  The Parties' Arguments

The parties agree Petitioner should be awarded $1,115.32 for her unreimbursed medical expenses. Petitioner's Damages Brief ("Brief") at 16-17, ECF No. 39; Respondent's Damages Brief ("Opp.") at 8; ECF No. 40. Thus, the only area of disagreement is regarding the amount of compensation which should be awarded for Petitioner's pain and suffering.

Emphasizing "the severity, duration, and chronic nature of her shoulder injury," Petitioner requests $110,000.00 for *past* pain and suffering, plus an annual award of $1,000.00 for *future* pain and suffering. Brief at 12. Asserting that the sequela of her SIRVA has spanned more than three and one-half years, Petitioner maintains that she

6

suffered moderate to severe levels of pain for fourteen months, and at least mild pain all other times. *Id.* at 10-11. Regarding her more than three-month delay before seeking treatment for her symptoms, Petitioner "describes herself as someone who typically avoids going to the doctor for as long as possible." *Id.* at 10. She also emphasizes her lack of knowledge regarding this type of injury, which she indicates was reinforced by the pharmacist's statement that he was unaware of this type of injury, and the lack of available appointments with her primary care provider ("PCP"). *Id.*

To support the amount she seeks for *future* pain and suffering, Petitioner reiterates her orthopedist's warning that the number of cortisone injections he can safely administer to Petitioner are limited – suggesting that the relief they have provided in the past will cease being available to her in the future. Brief at 11. She also maintains that her orthopedist "has told her that the recurrent nature of her symptoms leads him to believe that she has a tendon tear . . . that is unlikely to permanently resolve without surgery." *Id.* at 12.

Petitioner compares the facts and circumstances in her case favorably with those experienced by the petitioners in *Young, Binette, Danielson, Cooper, and Bruegging,* who received awards ranging from $90,000.00 to $130,000.00 for past pain and suffering.[8] Brief at 12-16. Additionally, the petitioners in *Binette and Danielson* also received a future award, representing the net present value of yearly awards of $1,000.00 and $250.00, respectively. *Binette,* 2019 WL 1552620, at *1; *Danielson,* 2020 WL 8271642, at *1.

Characterizing Petitioner's injury as comparatively minor, requiring only conservative treatment, Respondent argues that Petitioner should receive the lesser sum of $55,000.00 for her pain and suffering. Opp. at 6. He asserts that the severity of Petitioner's pain and course of treatment is comparable to that experienced by the petitioners in *Knauss* and *Rayborn*, who received awards ranging from $55,000.00 to $60,000.00.[9] Opp. at 6-7. Regarding the cases cited by Petitioner, he maintains that

---

[8] *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for past pain and suffering and an amount representing the net present value of $1,000.00 per year for future pain and suffering); *Danielson v. Sec'y Health & Human Servs.*, No. 18-1486V, 2020 WL 8271642 (Fed. Cl. Spec. Mstr. Dec. 29, 2020) (awarding $110,000.00 for past pain and suffering and an amount representing the net present value of $250.00 per year for future pain and suffering); *Cooper v. Sec'y Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for past pain and suffering and denying any award for future pain and suffering); *Young v. Sec'y of Health & Human Servs.*, No. 15-1241V, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019) (awarding $100,000.00 for past pain and suffering); *Bruegging v. Sec'y of Health & Human Servs.*, No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019) (awarding $90,000.00 for past pain and suffering).

[9] *Knauss v. Sec'y Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for past pain and suffering); *Rayborn v. Sec'y Health & Human Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (awarding $55,000.00 for past pain and suffering).

"these cases are inapposite because the petitioners received treatment for longer periods of time." Opp. at 7.

### B.   Analysis

#### 1.   Duration and Severity of SIRVA Injury

A thorough review of the medical records reveals that Ms. Bergstrom suffered severe pain and limited ROM for approximately five months post-vaccination, obtained almost six months of significant relief following a cortisone injection in early July 2018, and then experienced more moderate levels of pain and a mild limitation in ROM for approximately one month before receiving a second cortisone injection in late January 2019. After this second injection, Petitioner did not seek treatment again until more than *two years later*, in early February 2021. Although she attributes this later pain to her same SIRVA injury, she has not provided sufficient evidence to support this assertion.

##### i.   Initial Five Month Period: Vaccination Through Mid-July 2018

Prior to receiving the flu vaccine on January 29, 2018, Petitioner, age 69, suffered from hip and knee pain, right trigger thumb, and carpal tunnel syndrome. Exhibit 7 at 7-8. When seeking treatment for her left shoulder pain, on May 16, 2018, she complained of significant left shoulder pain, which was not alleviated by over-the-counter pain medication, interfered with her sleep and other daily activities, and caused a painful and limited ROM. Exhibit 2 at 7, 9. Although the more than 100-day gap between vaccination and this first appointment did not prevent me from finding pain onset within 24 hours as Petitioner alleged, especially given the support found in the records for her reluctance to seek medical treatment,[10] the lengthy delay *does* provide evidence that her pain was manageable for a long period of time, but eventually progressed into something more severe that she felt demanded treatment.

At her first orthopedic appointment on June 7, 2018, Petitioner provided additional information which confirms the existence of a significant SIRVA injury, involving increasing levels of pain and limitations in ROM. She described pain beginning a day after her vaccination, but progressively worsening until reaching the current level of nine to ten out of ten, adding that it woke her every two hours. Exhibit 2 at 9. Although the orthopedist opined Petitioner "most likely ha[d] some wear and tear of the [rotator] cuff which predate[d] the shot," he concluded that her condition was an inflammatory response to the flu vaccine. *Id.* at 10. He prescribed oral steroids and PT. *Id.* at 10.

---

[10] Fact Ruling, issued Dec. 4, 2020, at 5, ECF No. 22.

8

Petitioner's assertions are supported further by her PT records. At her initial PT session on June 13, 2018, Petitioner reported pain when she moved her arm, describing its level as five out of ten at rest and seven out of ten with activity. Exhibit 3 at 2. After attending seven sessions during the month of June, Petitioner's ROM and level of pain at rest had improved, but her pain with activity had increased to ten out of ten. *Id.* at 13.

When seen by her orthopedist on July 9, 2018, Petitioner continued to report severe pain, at a level of eight to nine. She indicated that she had obtained no relief from the oral steroids she was prescribed. Exhibit 2 at 7. The orthopedist observed that Petitioner's motion was improving but that "she is still having a lot of pain." *Id.* He administered a cortisone injection and instructed Petitioner to continue her PT. *Id.* at 7-8. Through the end of August 2018, Petitioner attended an additional fourteen PT sessions. Exhibit 3 at 19-50.

### ii. Relief for Six Months: Mid-July Through End of 2018

It appears Petitioner obtained significant relief from the cortisone injection administered in early July 2018 and subsequent PT. At an orthopedic appointment on August 13, 2018, she indicated that the injection had "helped dramatically," that "her motion [wa]s much improved," and that the PT she was attending "has been very helpful." Exhibit 2 at 5. She reported having no symptoms until the last day or two when she noticed "some discomfort around the shoulder." *Id.* The orthopedist remarked that Petitioner described almost no symptoms at rest but still rated her discomfort as four at rest and five with activity. *Id.* Presumably, the level four descriptor was for the infrequent occasions when she experienced pain at rest. At her last PT session on August 30, 2018, Petitioner was described as "show[ing] great motivation and improvement." Exhibit 3 at 49. She reported improved function with mild pain only during end of range activities. It was noted that Petitioner had met all PT goals. *Id.*

### iii. Return of Pain for One Month: January 2019

When Petitioner next sought treatment, from her orthopedist on January 24, 2019, she reported that "[s]he had no symptoms in the left shoulder until about three weeks ago." Exhibit 5 at 2. She rated her current pain, which was again interfering with her ability to sleep, as five at rest and seven with activity. Although Petitioner exhibited good ROM, the orthopedist recommended that she attend PT to "work on her cuff strength and stabilize her scapular." Id. Petitioner declined PT but opted for a second cortisone injection. Id.

9

*iv. Assertion of Later Pain*

Petitioner did not seek treatment again until more than two years later, on February 2, 2021. Exhibit 8 at 6-7. At that visit, she reported that the January 2019 cortisone injection had "helped dramatically," and that "for at least nine months . . . the pain went away, and the motion improved." *Id.* at 6. Rating the level of her current pain as six to eight at rest and seven with activities, Petitioner described it as progressively worsening over the last six to nine months. *Id.*

The orthopedist opined that Petitioner "probably has a partial tear of the tendon." Exhibit 8 at 6. He proposed an MRI, which Petitioner declined. *Id.* at 6-7. Instead, Petitioner requested a third steroid injection which was administered. Because of petitioner's reluctance to attend PT during the COVID pandemic, the orthopedist provided her with exercises to be performed at home. There is no evidence of further treatment.

Although Petitioner attributes this later pain to the SIRVA injury she suffered in January 2018, she has failed to provide preponderant evidence to support that assertion. Petitioner's February 2021 visit occurred more than two years after her last treatment in late January 2019. Such a lengthy treatment gap inherently suggests a manageable condition – and I have in many prior cases found that long gaps are unsupportive of high pain and suffering awards. *See, e.g., Norton v. Sec'y of Health & Human Servs.,* No. 19-1432V, 2021 WL 4805231, at *5-6 (Fed. Cl. Spec. Mstr. Sept. 14, 2021).

In addition, I must take some note of the fact that the 2021 visit occurred approximately *one month* after entitlement was conceded in this case and the parties began their damages discussions. And Petitioner's claim that she did not seek treatment for her shoulder pain due to the COVID-19 pandemic (Brief at 7) fails to account for the five months in late 2019 and early 2020 when she alleges her left shoulder pain had returned.[11] *See* Exhibit 8 at 6 (containing Petitioner's description of the return of her left shoulder pain).

Arguably, Petitioner could maintain that her pain returned in late 2019, but was not significant until 2020 - after the COVID pandemic was fully recognized. And the February 2, 2021 medical record contains evidence to support that characterization. See Exhibit 8 at 6 (indicating Petitioner's pain had worsened six to nine months ago – in late April to July 2020). However, that depiction reveals a *different* weakness in Petitioner's assertions. Vaccine Act cases involving SIRVA claims often reveal that when only

---

[11] According to information on the CDC website, the World Health Organization declared COVID-19 a pandemic on March 11, 2020. *See* https://www.cdc.gov/museum/timeline/covid19.html#:~:text=January%2C%202020%20CDC,18%20in%20Washington%20state (last visited Oct. 25, 2021).

temporary relief is gained by the administration of a cortisone injection, a petitioner's shoulder pain will inevitably return within one to six months post-injection. In this case, however, Petitioner appears to argue that the effects of her second cortisone injections lasted at least until April 2020, more that 14 months after injection.

It is more likely that Petitioner's later pain is due to the rotator cuff tear, which her orthopedist suspects she has,[12] or other conditions which existed prior to vaccination. In my experience, SIRVA injuries, especially those occurring in older individuals like Ms. Bergstrom, often involve the aggravation of preexisting conditions, previously asymptomatic. And Petitioner's orthopedist opined that Petitioner's SIRVA injury occurred in this manner. Exhibit 2 at 10. Petitioner has not provided preponderant evidence connecting the shoulder pain she complained of in February 2021, to the flu vaccine she received in January 2018.

### 2. Comparison to Other Awards

Although I commend the parties for identifying cases involving facts and circumstances they believe are similar to those suffered by Petitioner, I do not find those cases to be comparable. The cases cited by Petitioner involved symptoms of greater severity and duration than those suffered by Ms. Bergstrom. For example, the periods of significant pain and overall symptoms suffered by the *Cooper* petitioner were almost twice the duration. *Cooper,* 2018 WL 6288181, at *12. And the petitioners in both *Binette* and *Danielson* provided evidence of a permanent injury. *Binette*, 2019 WL 1552620, at *14-15; *Danielson,* 2020 WL 8271642, at *5. In contrast, the cases provided by Respondent involved a similar overall duration but no period of significant pain. In *Knauss,* for example, the petitioner reported pain at a level of only one out of ten. *Knauss,* 2018 WL 3432906, at *3.

Petitioner shares some similarities with the petitioner in *Bruegging,* who received an award of $90,000.00 for past pain and suffering. The *Bruegging* petitioner also suffered severe initial pain which abated after a second injection and PT and sequela which lasted ten months. *Bruegging,* 2019 WL 2620957, at *10. However, the *Bruegging* petitioner obtained only one week of relief after his first cortisone injection, and thus experienced greater levels of pain for a longer initial period – eight months instead of the five months experienced by Petitioner. *Id.* Furthermore, the *Bruegging* petitioner sought medical treatment for his shoulder pain 24 days post-vaccination. *Id.* at *9. Although Petitioner's more than 100-day delay did not prevent a finding of onset within 48 hours, it does provide evidence that her initial pain was not as great as that experienced by the petitioner in *Bruegging.*

---

[12] Because Petitioner declined the offered MRI, her orthopedist was unable to obtain confirmation for his belief. *See* Exhibit 8 at 7.

11

I find that the Petitioner's injury was more like SIRVAs suffered by petitioners who received awards of $80,000.00 for past pain and suffering. For example, in *Kent*, the petitioner first sought treatment for her shoulder pain 94 days post-vaccination, experienced severe levels of pain for approximately six months and gained relief after conservative treatment. *Kent v. Sec'y of Health & Human Servs.*, No. 17-0073V, 2019 WL 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019). This establishes a fair amount to be awarded for actual pain and suffering in this case.

I do not, however, include any component of damages for future pain and suffering. As I stated in *Accetta*, I find that an award for *future* pain and suffering is appropriate "only for cases where a strong showing is made that the claimant has suffered a permanent disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta v. Sec'y of Health & Human Servs.*, No. 17-1731V, 2021 WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). In this case, Petitioner has not established that the sequela of her SIRVA continued beyond early 2019.

## V.     Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $80,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[13] I also find that Petitioner is entitled to $1,115.32 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **I award a lump sum payment of $81,115.32 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[14]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.